George **VILLEGAS**, et al., Plaintiff(s),

v.

**CITY OF GILROY**, et al., Defendant(s).

No. C 01–20720JW.

United States District Court, N.D. California. San Jose Division.

April 5, 2005.

**1208**

Randolph H. Hammock, Law Offices of Richard M. Lester, Canoga Park, CA, for Plaintiffs.

Bronwen E. Lacey, Strombotne Law Firm, Mark L. Strombotne, Strombotne Law Firm, San Jose, CA, for City of Gilroy.

Gregory C. Simonian, Clapp, Moroney Bellagamba & Uncinich, Daly City, CA, for Gilroy Garlic Festival Association, Inc.

## ORDER DISMISSING DEFENDANT OFFICER D. BERGMAN FROM LAWSUIT AND GRANTING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

WARE, District Judge.

### I. INTRODUCTION

Plaintiffs George Villegas, Bob Poelker, Marcelo Orta, and Don Derosiers (collectively, "Plaintiffs") are members of the Top Hatters Motorcycle Club, a male-only motorcycle club. In 2000, Plaintiffs attended the Gilroy Garlic Festival sporting their Top Hatters Motorcycle Club vests, which are adorned with patches and pins that indicate their membership in the Club. Festival security officials, however, claimed that Plaintiffs' vests constituted "gang colors or insignia" and, therefore, violated the Festival's dress code policy. Festival security officials asked Plaintiffs to remove their vests, but Plaintiffs refused to comply. Festival security officials then expelled Plaintiffs from the Festival. Plaintiffs filed suit against the City of Gilroy and the Gilroy Garlic Festival Association, Inc. ("GGFA") (collectively "Defendants")[1] claiming violations of their First

---

1. Plaintiffs' Complaint also names Officer D. Bergman as a Defendant. However, "Officer D. Bergman was ... never served with summons and complaint, has never appeared, and is not a party before this Court." (City of

Amendment rights to free expression and free association under 42 U.S.C. § 1983. (Complaint, Docket Item No. 1, ¶¶ 14, 16.) Plaintiffs also claim violations of their free speech rights under CAL. CONST. art. I, § 2 (Liberty of Speech) and violations of their civil rights under California's Unruh Civil Rights Act, CAL. CIV. CODE § 51 et seq. (*See* Complaint, Docket Item No. 1, ¶¶ 18–19.) Presently before this Court are Defendants' Motions for Summary Judgment (hereinafter "Defendants' Motions"). (*See* City of Gilroy's Motion for Summary Judgment, hereinafter "City of Gilroy's Motion," Docket Item No. 60 *and* GGFA's Motion for Summary Judgment, hereinafter "GGFA's Motion," Docket Item No. 62.) On Tuesday, March 1, 2005, this Court held a hearing regarding Defendants' Motions. For the reasons set forth below, this Court grants Defendants' Motions.

## II. BACKGROUND

Gilroy, California. Population 20,000. Except early August. Then it swells fivefold. One hundred thousand people going bananas over GARLIC![2]

### A. The Gilroy Garlic Festival

Gilroy, California is sometimes referred to as the Garlic Capital of the World. (*See, e.g.,* Declaration of Richard Nicholls in Support of GGFA's Motion, hereinafter Nicholls Decl., Docket Item No. 63, ¶ 3.) Once a year, for a few days in the summer, GGFA, a non-profit corporation, sponsors and runs the Gilroy Garlic Festival. The Festival offers:

food, contests, music, and family recreation activities—with an emphasis on garlic—in a family friendly environment. The events and activities at the Festival include . . .: the Great Garlic Cook–Off cooking contest; Gourmet Alley, where garlic-laced calamari and scampi, garlic chicken stir fry, garlic sausage sandwich, and garlic bread are served; and a children's area, where magicians, dance troups, puppets, and jugglers offer entertainment geared toward children.

(Nicholls Decl. ¶ 2–3.)

The 2000 Gilroy Garlic Festival was held in Christmas Hill Park, a public park in the City of Gilroy, from July 28 to July 30. (Nicholls Decl. ¶ 4.) In order to secure this venue, GGFA entered into a facility reservation contract with the City of Gilroy. (Nicholls Decl. ¶¶ 5–6.) Under the terms of this agreement, GGFA was "required to have security at the Gilroy Garlic Festival" and to have police officers present. (Nicholls Decl. ¶ 7; Nicholls Decl. Ex. A at 4, 6.)

Security at the Festival is provided by the City of Gilroy Police Department and a private security company. The City of Gilroy Police Department staffs the Festival with a mixture of law enforcement officers from the City of Gilroy Police Department, the Santa Clara County Sheriff's Office, State Parole, and other local law enforcement agencies.

(Nicholls Decl. ¶ 8.)

GGFA itself "has a chair of security and an assistant chair of security, which are

Gilroy's Motion at 2:26.) Plaintiffs' counsel did not dispute this at the hearing. Accordingly, pursuant to FED. R. CIV. P. 41(b), this Court dismisses all of Plaintiffs' claims against Officer D. Bergman. *See* WILLIAM W. SCHWARZER, A. WALLACE TASHIMA & JAMES M. WAGSTAFFE, FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 16:431 (2004) ("Although Rule 41 nominally requires a motion by defendant, the court possesses inherent power to dismiss *sua*

*sponte, without notice or hearing,* 'to achieve the orderly and expeditious disposition of cases' ") (citing, *inter alia, Link v. Wabash R.R. Co.,* 370 U.S. 626, 630–32, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)).

2. Attributed to TWA AMBASSADOR MAGAZINE. *See* http://thegarlicstore.com/index.cgi/quotes.html.

non-paid volunteer positions[,] [one of whom is] [g]enerally ... a law enforcement officer with the City of Gilroy Police Department or another local law enforcement agency." (Nicholls Decl. ¶ 7; *see also* Declaration of G. Martin Velez in Support of GGFA's Motion, hereinafter Velez Decl., Docket Item No. 65, Ex. A at 86:13–17 (Q. ... [A]s far as you know for the many years you've been associated with the Gilroy Police Department or with the fair, whoever was asked [to serve as GGFA's chair of security] basically served; correct? [¶] A. True.).) "At the conclusion of the Festival, the City of Gilroy Police Department submits a bill for expenses incurred in providing law enforcement officers to staff the Festival to GGFA." (Nicholls Decl. ¶ 9.)

At the 2000 Gilroy Garlic Festival, GGFA had a dress code policy in place; although, as Plaintiffs point out, "at the time of this incident, there wasn[']t [sic] any *written* dress code policy in existence, nor was there any such policy posted at any place." (Plaintiffs' Opposition to Defendants' Motion, hereinafter Plaintiffs' Opposition, Docket Item No. 71, at 3:7–8.) According to GGFA's alleged dress code policy, "Persons wearing clothing with gang colors or insignia were allowed to remain at the Festival if they removed the clothing. Individuals refusing to remove clothing with gang colors or insignia were not permitted to remain at the Festival." (Nicholls Decl. ¶ 10.) This policy was "adopted as a response to an increase in gang related violence at the Festival in past years which had negatively impacted attendance at the Festival." (Nicholls Decl. ¶ 10.)

**B. Plaintiffs at the Gilroy Garlic Festival**

Plaintiffs are four members of the Top Hatters Motorcycle Club, a male-only non-profit corporation whose "specific ... purposes ... are to promote good will and understanding among disparate community groups and to raise and distribute funds to other charitable organizations or to needy individuals." (Velez Decl. Ex. B Ex. 1 at 2–5; *see also* Exhibits in Support of City of Gilroy's Motion, hereinafter City of Gilroy's Exhibits, Docket Item No. 69, Ex. 1 at 35:3–5.) In particular, Top Hatters are unified by their passion for motorcycles. (City of Gilroy's Exhibits Ex. 3 at 34:21–23.) Oftentimes, the Top Hatters organize and sponsor events with other motorcycle clubs (such as the Hells Angels) to raise money for charitable causes. (City of Gilroy's Exhibits Ex. 2 at 29:13–25.)

On July 30, 2000, Plaintiffs attended the Gilroy Garlic Festival to celebrate Plaintiff Bob Poelker's birthday. (Velez Decl. Ex. B at 11:4–11, Ex. E at 6:19–20, 31:11–14, 42:4–9.) Plaintiffs attended the Festival sporting their Top Hatters Motorcycle Club vests. (Velez Decl. Ex B at 11:19–20, 16:24–17:2.) These vests are made of either blue denim or black leather, and are adorned with various patches and pins that indicate membership in the Top Hatters. (Velez Decl. Ex. F; City of Gilroy's Exhibits Ex. 5.) On their backs is a large insignia depicting a human skull wearing a top hat. From behind the skull, and on either side of it, stretch two bird-wings. Above the insignia, in large letters, appear the words "Top Hatters." Below the insignia appears the word "California." However, at the time of the 2000 Gilroy Garlic Festival, the word "Hollister" appeared below the insignia. (City of Gilroy Exhibits Ex. 1 at 18:1–8.)

As Plaintiffs entered the Festival sporting their vests, Gilroy Police Sergeant Donald Kludt, GGFA's chair of security, spotted Plaintiffs, contacted Gilroy Police Officer Bergman, and requested that she escort Plaintiffs back to the gate. Officer Bergman was armed and uniformed and

assigned to Festival security. (City of Gilroy's Motion at 2:2; Velez Decl. Ex. A at 59:9–15, 65:14–15, 66:9–10; 68:2–4, Ex. B at 12:20–16:3; City of Gilroy's Exhibits Ex. 1:71:20–24.) In his deposition, Sergeant Kludt explained why he contacted Officer Bergman for assistance:

Q. Was it the fact that she [Officer Bergman] was an armed uniformed officer, was that part of your thought process in wanting her to be with you?

A. Yeah.

Q. Because you were not armed; correct?

A. Correct.

Q. And you were not uniformed; correct?

A. Correct.

Q. And you wanted Officer Bergman to assist you because she would give some air of authority as a police officer; correct? ...

[Objection]

Q. Would that be a fair statement?

A. Yes.

(Velez Decl. Ex. A at 67:4–20.)

Officer Bergman approached Plaintiffs and requested that they follow her to the gate. (City of Gilroy's Exhibits Ex. 1 at 71:18–19.) Plaintiffs complied. Once they arrived at the gate, Sergeant Kludt, who was dressed in plain clothes, explained GGFA's dress code policy to Plaintiffs. (Velez Decl. Ex. A at 59:9–15, 79:5.) "I told them that if they refused to remove their [gang] colors and enjoy the festival that we will ask them to leave and then we will refund their money, their entry fee into the festival." (Velez Decl. Ex. A at 79:5–9.) Plaintiffs, however,

felt that this was not right, that they had their rights to wear their vests where they wanted to and this was not right. And I [Sergeant Kludt] told them: Well, I have a policy and I'm enforcing this policy and I'm asking you to leave if

you're choosing not to, you know, come into the festival without your colors.

So they left. And then I walked around with them, went to the ticket booth and ordered those people to refund these people their money.

Q. Where was Officer Bergman at the time?

A. Standing next to me.

(Velez Decl. Ex. A at 79:15–25.)

Defendants advance a number of arguments to support their Motions. This Court addresses three, in particular. First, Defendants argue generally that Plaintiffs' claims under 42 U.S.C. § 1983 fail because neither of them were "state actors." (*See* City of Gilroy's Motion at 8:1–10:15 *and* GGFA's Motion at 13:6–20:15.) Second, Defendants argue specifically that Plaintiffs' claim under 42 U.S.C. § 1983 for violation of their First Amendment right to free expression fails because Plaintiffs' conduct was not "speech" protected by the First Amendment. (*See* City of Gilroy's Motion at 5:7–7:27 *and* GGFA's Motion at 5:19–10:1.) Third, Defendants argue specifically that Plaintiffs' claim under 42 U.S.C. § 1983 for violation of their First Amendment right to free association fails because Plaintiffs do not have a right to associate with the Top Hatters. (*See* City of Gilroy's Motion at 8:1–10:15 *and* GGFA's Motion at 10:24–11:16.) This Court addresses each of these arguments below.

### III. STANDARDS

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fᴇᴅ. R. Cɪᴠ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A movant for summary judgment always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. If the movant does not satisfy this initial burden, the non-movant has no obligation to produce anything and summary judgment must be denied. If, however, the movant meets this initial burden, then the burden shifts to the non-movant to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. In other words, to preclude entry of summary judgment, the non-movant must bring forth genuine issues of material fact. An issue of fact is "genuine" if it can reasonably be resolved in favor of either party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* In short, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

It is this Court's responsibility "to determine whether the 'specific facts' set forth by the non-movant, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v. Pac. Elec. Contractors,* 809 F.2d 626, 631 (9th Cir.1997). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. In con-ducting its analysis, this Court must draw all reasonable inferences in favor of the non-movant. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505).

## IV. DISCUSSION

Title 42 U.S.C. § 1983 states that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights ... secured by the Constitution ... shall be liable to the party injured ....

Thus, in order for Plaintiffs to prevail on their claims against Defendants for violating their First Amendment rights to free expression and free association, Plaintiffs must prove, *inter alia,* that Defendants acted "under color of law" and "deprived them of their Constitutional rights." 1 SHELDON H. NAHMOD, CIVIL RIGHTS AND CIVIL LIBERTIES LITIGATION: THE LAW OF SECTION 1983 § 2:1, at 2–5 (4th ed. 2004) ("[Section] 1983 requires that the challenged conduct be 'under color of law'"); *id.* § 2:1, at 2–3 ("In order to establish a prima facie § 1983 cause of action based on a constitutional violation, the plaintiff must prove that the defendant's conduct ... cause[d] ... plaintiff's constitutional deprivation").

### A. State Action

First, Defendants argue generally that Plaintiffs' claims under 42 U.S.C. § 1983 fail because neither of them were "state actors." (*See* City of Gilroy's Motion at 8:1–10:15 *and* GGFA's Motion at 13:6–20:15.) As mentioned above, 42 U.S.C. § 1983 requires Plaintiffs to prove that Defendants acted "under color of law." *See* NAHMOD, *supra,* § 2:1, at 2–5 ("[C]olor

of law is a condition precedent to stating a § 1983 claim"). "For all practical purposes, according to the Supreme Court, 'color of law' and state action are the same where Fourteenth Amendment violations are involved and mean that § 1983 regulates state and local governmental conduct, as distinct from purely private conduct." *Id.* § 2:4, at 2–11 (footnote omitted).

### 1. City of Gilroy Arguably Was a State Actor

#### a. Officer Bergman's Actions Constituted State Action

City of Gilroy argues that Officer Bergman's actions were not state action, but rather "[m]ere acquiescence . . . to [ ]stand by in case of trouble[.]" (City of Gilroy's Motion at 9:20 (quoting *Harris v. City of Roseburg,* 664 F.2d 1121, 1127 (9th Cir. 1981)) (holding that a police officer's mere acquiescence to stand by in case of trouble is not state action).) City of Gilroy cites two cases to support its argument: *Harris v. City of Roseburg,* 664 F.2d 1121 (9th Cir.1981), and *Barrett v. Harwood,* 189 F.3d 297 (2d Cir.1999). City of Gilroy's argument is unpersuasive.

Ironically, *Harris* and *Barrett* support Plaintiffs' case more than they support City of Gilroy's. Both cases involved police presence at the scenes of unlawful private vehicle repossessions. Although the *Harris* court noted that, *"mere acquiescence* by the police to 'stand by in case of trouble' is insufficient to convert a [private] repossession into state action," in the very same sentence, it also noted that, "police *intervention* and *aid* in the repossession *does* constitute state action." *Harris,* 664 F.2d at 1127 (emphasis added). In fact, the *Harris* court explicitly concluded that, "there *may* be a deprivation within the meaning of § 1983 . . . when [an] officer *assists* in effectuating a repossession . . . or so *intimidates* a debtor as to cause him to refrain from exercising his

legal right to resist a repossession." *Id.* (emphasis added). Similarly, in *Barrett,* although the court noted that, "a police officer's *mere presence* at the scene is insufficient to constitute state action," it also noted that, "[w]hen an officer *begins to take a more active hand* in the repossession, and as such involvement becomes increasingly critical, a point may be reached at which police assistance at the scene of a private repossession may cause the repossession to take on the character of state action." *Barrett,* 189 F.3d at 302.

■ Here, Officer Bergman's actions were more than "mere acquiescence to stand by in case of trouble" or "mere presence." Officer Bergman was armed and uniformed. Upon Sergeant Kludt's direction, Officer Bergman actively approached Plaintiffs, seized them, and physically escorted them to the gate. Sergeant Kludt explicitly testified that "the fact that [Officer Bergman] was an armed uniformed officer" was part of his thought process in soliciting her assistance. (Velez Decl. Ex. A at 67:4–5.) Sergeant Kludt "wanted Officer Bergman to assist [him] because she would give some air of authority as a police officer[.]" (Velez Decl. Ex. A at 67:12–14.) Sergeant Kludt's strategy achieved its intended effect. Plaintiff Donald Desrosier testified that he obeyed Officer Bergman precisely because "she was in uniform." (Velez Decl. Ex. C at 13:1–2; *see also* Velez Decl Ex. B at 12:4–7 (wherein Plaintiff George Villegas testifies that Officer Bergman was armed and uniformed) *and* Velez Decl. Ex. D at 14:11–12 (wherein Plaintiff Marcelo Orta testifies that Officer Bergman was uniformed).) Officer Bergman was not "merely present." Rather, she had an active hand in assisting in enforcing GGFA's dress code policy by intimidating Plaintiffs into leaving the festival. Therefore, Officer Bergman was a state actor.

### b. *Monell* Liability Arguably Applies Here

The mere fact that Officer Bergman was a state actor is, in and of itself, insufficient to establish City of Gilroy's liability. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("a municipality cannot be held liable under § 1983 on a *respondeat superior* theory"); *id.* at 694, 98 S.Ct. 2018 ("We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents"). To prevail against City of Gilroy, Plaintiffs must show that Officer Bergman acted pursuant to an official policy or governmental custom of the City of Gilroy. *Id.* at 690–91, 98 S.Ct. 2018 ("although the touchstone of the § 1983 action against a government body is an allegation that *official policy* is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' . . . may be sued for constitutional deprivations visited pursuant to *governmental 'custom'* even though such a custom has not received formal approval through the body's official decisionmaking channels") (emphasis added).

City of Gilroy facilely argues that it can only be held liable under § 1983 if Plaintiffs can prove that "action pursuant to *official municipal policy* of some nature caused a constitutional tort." (City of Gilroy's Motion at 8:11–13 (quoting *Monell*, 436 U.S. at 691, 98 S.Ct. 2018).) "In the case at bar," City of Gilroy argues, "the policy by which Plaintiffs were denied admission to the festival was entirely the policy of a private organization, [GGFA], and not a policy statement, ordinance, regulation, or decision officially adopted and promulgated by City of Gilroy." (City of Gilroy's Motion at 9:3–5.) "As a result," City of Gilroy concludes, "there is no 'state action[.]'" (City of Gilroy's Motion at 9:10.)

■ City of Gilroy, however, misstates the law. Under *Monell*, local governments can be liable for depriving a person's constitutional rights, if that deprivation was a result of policy *or* governmental custom. To reiterate: "[L]ocal governments, like every other § 1983 'person,' . . . may be sued for constitutional deprivations visited pursuant to *governmental 'custom'* even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018 (emphasis added). "[C]ustom includes well-settled practices of government officials which are *not* 'authorized by written law.'" NAHMOD, *supra*, § 6:6, at 6–21–6–22 (emphasis added) (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

True, the dress code policy was GGFA's "official policy"—and not City of Gilroy's. However, City of Gilroy arguably had a governmental custom of using its police officers to enforce GGFA's dress code policy. For example, Sergeant Kludt testified that, as far as he knew, in the thirty years that he worked for the Gilroy Police Department, only one officer ever declined to serve as GGFA's chair of security. (Velez Decl. Ex. A at 86:7–19.) With the sole exception of that one officer, "whoever [in the Gilroy Police Department] was asked [to serve as GGFA's chair of security] basically served[.]" (Velez Decl. Ex. A at 86:15–16.) Furthermore, Sergeant Kludt testified that, since the Festival's inception, he himself "had worked every festival as a police officer." (Velez Decl. Ex. A at 39:12–13; *see also* Nicholls Decl. ¶ 7 ("Generally, either [GGFA's] chair of security or the assistant chair of security is a law enforcement officer with the City of Gilroy Police Department or another local law enforcement agency") *and* Declaration of Gregg Giusianna in Support of City of Gilroy's Motion, Docket Item No. 60, ¶ 4

("The Gilroy Police provide[s] approximately 25% of the total security personnel for the Festival").) Therefore, in this case, City of Gilroy can arguably be held liable under 42 U.S.C. § 1983, if Officer Bergman, while enforcing GGFA's policies, violated Plaintiffs' constitutional rights. This Court will address this latter question in *infra* Part IV.B.

### 2. GGFA Was Not a State Actor

As an alternative basis for liability, Plaintiffs argue that GGFA was a state actor for purposes of 42 U.S.C. § 1983. The United States Supreme Court has held that, under certain circumstances, private actors can be deemed state actors. *See, e.g., Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (holding that a privately owned restaurant, which leased property in an off-street automobile parking facility from a state agency, was a state actor). In *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 835–36 (9th Cir. 1999), the Ninth Circuit enumerated the four different tests that courts use to determine whether a private party is a state actor. (*See* GGFA's Motion at 13:22–25.)

> When addressing whether a private party acted under color of law, we therefore start with the presumption that private conduct does not constitute governmental action. . . . In order for private conduct to constitute governmental action, 'something more' must be present. . . .

Courts have used four different factors or tests to identify what constitutes 'something more': (1) public function, (2) joint action, (3) governmental compulsion or coercion, and (4) governmental nexus.

*Sutton*, 192 F.3d at 835–36 (citations omitted). These tests are not mutually exclusive of one another. *See* NAHMOD, *supra*, § 2:4, at 2–14 ("It should be emphasized that none of the state action approaches . . . is exclusive of any of the others").

GGFA argues that its actions cannot satisfy any of the tests enumerated in *Sutton*, and so it is not a "state actor" for purposes of 42 U.S.C. § 1983. In particular, GGFA persuasively cites two factually analogous cases: *United Auto Workers v. Gaston Festivals, Inc.*, 43 F.3d 902 (4th Cir.1995), and *Lansing v. City of Memphis*, 202 F.3d 821 (6th Cir.2000). In *United Auto Workers*, Plaintiff United Auto Workers (UAW) filed a § 1983 action against Gaston Festivals, Inc. ("GFI"), the private, non-profit corporate organizer of Gastonia, North Carolina's annual festival called the Fish Camp Jam.[3] UAW claimed that GFI violated its First Amendment rights when GFI denied it booth space at the Fish Camp Jam. UAW had applied for booth space to distribute literature on its "Buy American" campaign. GFI denied UAW's application, because its booth approval policy dictated that " 'issues' which are likely to foster confrontation or argu-

---

**3.** The festival's name derives from Gaston County's unique restaurants, called 'Fish Camps,' which were built along the banks of the county's two rivers to serve the local fishermen's catch. Visitors to the festival are treated to musical acts, games, and contests, and can even go fishing at the festival's fishing hole. Children are entertained by storytellers, jugglers, and clowns. And the festival hosts an art contest and vintage car display. There are also two designated food areas, Fish Camp Row and Gaston Flavors, where volunteers fry over four tons of fish and

'countless hushpuppies' in eight hours. The most popular attraction is the traditional 'catfish races,' where 'farmed raised catfish are run in heats,' with the winner determined in a final race. . . .

"The Fish Camp Jam, in short, is a 'one day community celebration' to build civic pride, showcase local talent, food, and culture, and provide entertainment for the local community. Its purpose is to provide a day of good, clean fun for the citizens of Gaston County." *UAW*, 43 F.3d at 904.

ment not be given a forum either pro or con in this setting." *UAW*, 43 F.3d at 905. The Fourth Circuit ruled in favor of GFI, holding that it was not a state actor for purposes of § 1983. It observed:

> The consequences of finding state action in this case would be difficult to overstate. Were we to hold that the incidental power to exclude others from public property during the course of a limited, permitted use transformed the permit holder into a state actor, softball teams on the Mall in Washington, D.C. would be constitutionally obliged to afford due process to those not allowed to play on the particular field at the same time. Every family that barbecues at a public park would theoretically be barred from excluding uninvited guests on constitutionally suspect grounds. The local church could no longer use public facilities to hold events for fear of violating the Establishment Clause. Every picnic, wedding, company outing, meeting, rally, and fair held on public grounds would be subject to constitutional scrutiny merely because the organizer had been granted exclusive use of city facilities ... as well as authority to determine who may use those ... facilities and what they may say while on the public fora.

*Id.* at 911.

*Lansing*, perhaps, is even more on point. There, Plaintiff Kenneth Lansing, a street preacher, filed a § 1983 action against Memphis in May International Festival, Inc. ("MIMIFI"), the private, non-profit corporate organizer of Memphis, Tennessee's annual festival called Memphis in May.[4] Lansing claimed that MIMIFI violated his Constitutional rights when it and the Memphis Police Department forced him to move his street preaching activities away from areas contiguous to Memphis in May's entrance gates. MIMIFI had signed a lease agreement with the City of Memphis for Tom Lee Park and a park use agreement with the Memphis Park Commission, and had received a Memphis City Council resolution closing the streets surrounding the festival site to vehicular traffic. The lease provided that "Lessee shall comply with the directives of the Memphis Police Department ... to minimize interference with traffic in and out of said area so as not to create a nuisance[.]" *Lansing*, 202 F.3d at 825. The park use agreement provided that "[t]he applicant accepts responsibility for ... complying with all ... county and city authorities and agencies." *Id.* at 826. On at least two occasions in May 1997, Lansing appeared outside Memphis in May's entrance gates, "preaching, counseling, leafletting and holding signs." *Id.* at 827. "When, after some time, [MIMIFI] representatives asked him to move off the leased property, he responded that he would only move at the request of a police officer. An officer was summoned and made the request, and Lansing moved." *Id.* The Sixth Circuit ruled in favor of MIMIFI, holding that it was not a state actor for purposes of § 1983. With respect to the nexus between MIMIFI and the Memphis Police Department, the court observed:

> The [MIMIFI] representative found an officer and asked for assistance, and the officer complied. If this were all that was required to find state action, then every private citizen who solicited the aid of the police in resolving disputes or in ejecting unwanted persons would be

---

4. "The festival includes a number of events throughout the month; however, the three largest events sponsored by Memphis in May are the Beale Street Music Festival, the World Championship Barbecue Cooking Contest, and the Sunset Symphony. Each of these events is held on a different weekend in May in Tom Lee Park, and each routinely draws over 200,000 people." *Lansing*, 202 F.3d at 825.

transformed into a state actor. A mere request for assistance from an available police officer cannot be sufficient to form a nexus between the state and the private action.

*Id.* at 833.

■ Given the factual similarities between this case and *UAW* and *Lansing,* this Court adopts the reasonings in *UAW* and *Lansing.* Accordingly, this Court holds that GGFA is not a state actor for purposes of § 1983. Therefore, summary judgment in GGFA's favor is appropriate.

**B. Plaintiffs' Vests Are Not Expressive Conduct**

■■ Having concluded, in *supra* Part IV.A.1., that City of Gilroy can be liable under 42 U.S.C. § 1983, this Court now considers whether Officer Bergman deprived Plaintiffs of their First Amendment rights. The First Amendment literally forbids the abridgement of "speech" only. However, the United States Supreme Court has recognized that the First Amendment can, at times, protect *conduct* if it is "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (citing *Spence v. Washington,* 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)). In deciding whether particular conduct possesses sufficient communicative elements to trigger First Amendment protection, courts engage in a two-pronged analysis. First, they ask "whether [a]n intent to convey a particularized message was present." *Id.* Second, they ask "whether the likelihood was great that the message would be understood by those who viewed it." *Id.* Context is a key factor in applying this analysis. Wendy Mahling, Note, *Secondhand Codes: An Analysis of the Constitutionality of Dress Codes in the Public Schools,* 80 MINN. L. REV. 715, 724 (1996)

("The context in which symbolic speech occurs determines to a significant extent whether First Amendment protection applies"). The specific contexts in which courts have determined that particular conduct is "expressive conduct" (i.e., speech protected by the First Amendment) include: the burning of an American flag outside the 1984 Republican National Convention to protest the policies of the Reagan administration, *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); the placement of a peace symbol on an upside down American flag, by a college student, to protest the U.S. military invasion of Cambodia and killings at Kent State University, *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); the wearing of a military uniform, by an activist-actor, in a dramatic presentation criticizing American involvement in Vietnam, *Schacht v. United States,* 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970); and the wearing of black armbands at school, by junior high and high school students, in protest of the Vietnam War, *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Comparing these cases to the case at hand, it is clear that Plaintiffs' wearing of their Top Hatters Motorcycle Club vests at the Gilroy Garlic Festival is not expressive conduct. As a preliminary matter, it is unclear what, if any, *particularized* message Plaintiffs intended to convey. Plaintiff George Villegas testified that the skull on the Top Hatters' insignia represented "[t]he belief [that] underneath our skin all of us are alike[,]" that the wings represented freedom, and that the top hat represented "[t]he original Top Hatters." (Velez Decl. Ex. B at 38:19, 38:24–25, 39:17.) Plaintiff Donald Desrosiers interpreted the insignia slightly differently. To him, "[T]he top hat represented the original [Top Hatters] who are still alive and

still part of us. And the wings meant freedom to me.... And what the skull meant to me was death. You're free until you're dead, was the way I looked at it." (Velez Decl. Ex. C at 33:22–34:3.) To Plaintiff Marcelo Orta, only the insignia's top hat possessed symbolic meaning. (Velez Decl. Ex. D at 30:2–4 ("[Q. The top hat is] the only part of the insignia that symbolizes something? [¶] A. Yes.").) Fraternity, freedom, equality, and/or death are not particularized messages. Even if they were, it is unlikely that, in the specific context of the Gilroy Garlic Festival, Festival attendees would understand that message. Accordingly, this Court holds that Plaintiffs' wearing of their Top Hatters Motorcycle Club vests did not constitute expressive conduct worthy of First Amendment protection, and grants all Defendants summary judgment on Plaintiffs' First Claim (Violation of Plaintiffs' First Amendment Rights to Free Expression).

## C. No Freedom of Association

As a final matter, Plaintiffs claim that Defendants violated their First Amendment right to free association. (*See* Complaint ¶ 16.)[5] The First Amendment does not explicitly refer to a freedom of "association." U.S. CONST. amend. I ("Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances"). Nevertheless, the freedom of association is a long-recognized constitutionally-protected freedom that courts have located within the penumbra of the First Amendment. *See Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) ("The right of association [is] contained in the penumbra of the First Amendment"); *see also* 16A

AM. JUR.2d *Constitutional Law* § 539 (2004) ("[T]he United States Supreme Court has concluded that a right to freedom of association exists as one of the necessary concomitants to the more specific guarantees of the First Amendment—in short, as a penumbral right, making the others more secure, it being the case that one may not exercise the right to assemble alone, and that frequently the effective exercise of the freedoms of speech, press, and petition requires group or associational activity") *and* Stephen Clark, *Judicially Straight? Boy Scouts v. Dale and the Missing Scalia Dissent*, 76 S. CAL. REV. 521, 538 (2003) ("Freedom of association is, at best, an implied right, extrapolated from the First Amendment"). As the United States Supreme Court has put it, " '[I]mplicit in the right to engage in activities protected by the First Amendment' is 'a corresponding right to associate with others ....' " *Boy Scouts of America v. Dale*, 530 U.S. 640, 648, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)).

The First Amendment protects two distinct types of "association": "intimate association" and "expressive association."

> In one line of decisions, the Court has concluded that choices to enter into and maintain certain *intimate human relationships* must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty.

*Roberts*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (emphasis add-

---

**5.** Plaintiffs' Opposition makes no mention of the right to free association. (*See* Plaintiffs' Opposition.) However, because Plaintiffs'

counsel, at the hearing, reasserted Plaintiffs' claim under their right to free association, this Court will address their claim.

ed). This is the freedom of intimate association. "In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 618, 104 S.Ct. 3244. This is the freedom of expressive association.

■ The freedom of expressive association is at issue here.[6] "The constitutional right to free association for expressive purposes is an *instrumental* one; expressive association is protected as an indispensable means of preserving *other individual liberties.*" 16A Am. Jur.2d *Constitutional Law* § 539 (emphasis added). In other words, to determine whether a group is protected by the First Amendment's expressive associational right, a court must first determine, as a preliminary matter, whether that group engages in "expressive association" otherwise protected by the First Amendment. *Dale,* 530 U.S. at 648, 120 S.Ct. 2446; *see also* Jason Mazzone, *Freedom's Associations,* 77 Wash. L. Rev. 639, 670 (2002) ("In order to determine whether a group is protected by the First Amendment, the [United States Supreme] Court observed that the initial question is 'whether the group engages in [ ]expressive association[ ]' ").

■ This Court has already held that Plaintiffs were not engaged in expressive conduct and that no cognizable First Amendment right to "speech" arises in this case. (*See, supra,* Part IV.B.; *see also* Velez Decl. Ex. B at 28:14–17 (Deposition of Plaintiff George Villegas) ("Q. So you [the Top Hatters] don't advocate any certain viewpoints, . . . religious, political, any certain viewpoint like that? [¶] A. No.").) Accordingly, no right of association arises here. Therefore, this Court grants all Defendants summary judgment on Plaintiffs' Third Claim (Violation of Plaintiffs' First Amendment Rights to Free Association).

## V. CONCLUSION

For the reasons set forth above, this Court dismisses Plaintiffs' Second Claim (Violation of Plaintiffs' Rights to Free Expression Against Officer Bergman) and Fourth Claim (Violation of Plaintiffs' Rights to Free Association Against Officer Bergman). Furthermore, this Court grants Defendants' Motions for Summary Judgment on Plaintiffs' First Claim (Violation of Plaintiffs' Rights to Free Expression Against City of Gilroy and GGFA) and Third Claims (Violation of Plaintiffs' Rights to Free Association Against City of Gilroy and GGFA). Plaintiffs' remaining claims—i.e., Plaintiffs' Fifth Claim (Violation of Plaintiffs' Free Speech Rights Under Cal. Const. art. I, § 2) and Sixth Claim (Violation of Plaintiffs' Civil Rights Under California's Uhruh Civil Rights Act)—arise exclusively under state law. This Court declines to exercise supplemental jurisdiction over Plaintiffs' Fifth and Sixth Claims. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original juris-

---

**6.** The freedom of intimate association is not at issue here. The freedom of intimate association extends to those human relationships that "attend the creation and sustenance of a family—marriage; childbirth; the raising and education of children; and cohabitation with one's relatives." *Roberts,* 468 U.S. at 619, 104 S.Ct. 3244 (citations omitted). These "[f]amily relationships, by their nature, in-

volve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Id.* at 619–20, 104 S.Ct. 3244. No one here claims that the Top Hatters' mutual relationships are of this nature.

diction"). Accordingly, it dismisses Plaintiffs' remaining claims without prejudice to their being reasserted in state court.