Daniel LEE; Michael Carr; Edward Gathright; and Jeremy Sonnier, Plaintiffs–Appellants,

v.

Vera KATZ; James Francesconi; Charles Jordan; Shane Nicholson; Stephanie Dekoeyer; John Montgomery; J.M. Patterson; Robert Hawkins; Kimberley Adams; Curtis Chinn; Mace Winter; Brian Duddy; Stuart Palmiter; Timothy Bacon; Oregon Arena Corporation; Michael Fennell; Pioneer Courthouse Square, Inc.; and Portland Rose Festival Association, Defendants–Appellees.

No. 00–35755.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 12, 2001

Filed Jan. 10, 2002

Herbert G. Grey, Beaverton, Oregon, for the plaintiffs-appellants.

Karen O'Kasey, Schwabe, Williamson, and Wyatt, Portland, Oregon, for the defendants-appellees.

Before: DAVID R. THOMPSON, TASHIMA, and GRABER, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

The plaintiffs are self-described "street preachers" who brought this lawsuit in the district court under 42 U.S.C. § 1983 seeking to enjoin the defendants' alleged violations of their First and Fourteenth Amendment rights to preach the Gospel of Jesus Christ on the Rose Quarter Commons, an outdoor area next to city-owned public facilities in the city of Portland. Only the Oregon Arena Corporation (OAC) and its general counsel, Michael Fennell, are parties in this appeal.[1] The other de-

1. Both the OAC and Fennell, who joined in the OAC's appellate brief, were alleged to be

fendants were dismissed either voluntarily or by an order of the district court that the plaintiffs do not challenge.

The OAC leased the Commons and some of the adjacent structures from the City of Portland. In connection with its administration of the leased area, it promulgated policies regulating speech on the Commons. In general, those policies regulated the areas on the Commons where public speaking could occur, the conduct of the speaker and the volume of the speech. Because the plaintiffs violated the OAC's public speech policy, they were excluded from the Commons for limited periods of time. That prompted this lawsuit.

After a bench trial, the district court granted judgment in favor of the OAC. The court determined that the OAC was not a State actor, and thus any abridgment of the plaintiffs' constitutional rights was not State action within the meaning of 42 U.S.C. § 1983. The plaintiffs appeal.

We have jurisdiction under 28 U.S.C. § 1291, and we reverse. We conclude that, in regulating speech on the Commons, the OAC is a State actor. Thus, the plaintiffs' § 1983 action is viable. We remand to the district court for it to determine whether the restrictions imposed by the OAC's public speech policy are reasonable restrictions on the time, place, and manner of protected speech, and are narrowly tailored to serve a significant governmental interest. *See Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

I

The Rose Quarter Commons is a large open-air plaza in Portland, Oregon, next to the Rose Garden Arena, Memorial Colise-

um, One Center Court, and three parking garages. Portland owns the real property on which the Commons is located, as well as the Coliseum and two of the parking garages. The OAC, a private corporation, owns the rest of the structures, the Arena, One Center Court, and Garden Garage.

The OAC has never challenged the plaintiffs' characterization of the Commons as a traditional public forum. In its brief, the OAC concedes that "the government may impose reasonable time, place and manner restrictions on public fora *such as the Rose Quarter Commons.*" (Emphasis added).

From January 1993 through June 1997, the OAC leased the Commons from the City of Portland. The lease required the OAC to "permit access to and free speech on the [Commons] as may be required by laws." The lease expired and was not renewed, but the OAC continues to act as the exclusive lessee of the Commons under terms substantially similar to those of the lease.

In its administration of the leased area, the OAC promulgated a Code of Conduct for the Commons that includes free speech policies. The Code prohibits "[y]elling or screaming with the intention of disturbing persons or disturbing a lawful assembly; or playing radios, musical instruments or any other sound producing or reproducing equipment which is plainly audible at a distance of 25 feet." The Code also prohibits disturbing the peace, acting for the purpose of disturbing the peace, physically threatening anyone, engaging in tumultuous behavior, provoking a disturbance, or embroiling others in open conflict. The OAC's "Petitioning and Free Speech Rules" define free speech as "conduct by a

---

"State actors" who violated the plaintiffs' constitutional rights. For purposes of this appeal, we need not consider Fennell's potential

liability independent of the OAC. Thus, both are referred to as "the OAC."

speaker ... which has a purpose that is constitutionally protected, including the dissemination or distribution of expressive material." If a person violates the rules, then the OAC may issue an exclusion order barring him or her from returning to the Commons for a limited period.

The OAC designated three free speech zones within the Commons, each approximately 10 feet by 10 feet in size. The OAC believes that by designating these areas for free speech activity it is better able to monitor the safety of both patrons and speakers, in order "to prevent potentially violent confrontations and to maintain the quality of entertainment that the OAC offers at the Rose Quarter." The OAC also asserts that this policy prevents speakers from impeding the high-volume flow of patrons to and from events and parking.

The OAC's policies were developed, and are administered, independent of the City of Portland or any other public entity. The OAC supplied copies of its policies to the Assistant District Attorney of Multnomah County (which county encompasses the City of Portland) and to a sergeant in Portland's traffic division, but did not solicit any governmental comment or approval. The OAC enforces its policies with both in-house security officers and contracted security personnel.

The plaintiffs describe themselves as street preachers who believe it is their religious duty to spread the Gospel of Jesus Christ by engaging in open-air preaching. Such preaching includes making oral statements and carrying signs and banners with religious messages. The plaintiffs engage in this preaching at various locations, including the Commons. On several occasions, persons using the Commons have taken offense at the plaintiffs' conduct and language. Potentially violent confrontations have ensued.[2] The plaintiffs have also, on occasion, violated the free speech zones. In some instances, the OAC has issued orders excluding the plaintiffs from the Commons for specified time periods.

In response to the OAC's exclusion orders, the plaintiffs brought this suit seeking injunctive relief under 42 U.S.C. § 1983, alleging violations of their First and Fourteenth Amendment rights. After a bench trial based primarily on stipulated facts, the district court concluded that the OAC, a private entity, is not a State actor subject to § 1983 liability. The court determined that the City is not entwined with the OAC's management and control of the Commons, the Commons is not encumbered by an easement for public access, and the plaintiffs failed to show that the OAC and its security personnel perform any functions that are exclusively reserved to the City. The court entered judgment for the defendants, and this appeal followed.

## II

We review de novo the district court's conclusion that the OAC is not a State actor and review for clear error its findings of fact. *See Neal v. Shimoda*, 131 F.3d 818, 823(9th Cir.1997) (mixed questions of law and fact implicating constitutional rights reviewed de novo); *Freeman v. Allstate Life Ins. Co.*, 253 F.3d 533, 536 (9th Cir.2001) (findings of fact reviewed for clear error). The plaintiffs bear the bur-

---

**2.** For example, on one occasion plaintiff Lee preached so loudly that his voice could be heard over an African marimba band performing on a stage in the Commons. He flailed his arms about, called people in the area whores, and told them they were going to burn in hell. On another occasion, his preaching in a similar manner attracted a crowd that physically assaulted him. Plaintiff Gathright also preached in the Commons, calling a woman a whore, a prostitute, and a daughter of Babylon, which incited a shouting match between him and the man escorting the woman.

den of establishing by a preponderance of the evidence that the OAC is a State actor for Fourteenth Amendment purposes. *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 156, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

■■■ Conduct that is actionable under the Fourteenth Amendment as State action is also action under color of State law supporting a suit under § 1983. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). "[S]tate action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n.,* 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).

■■■ "What is fairly attributable [as State action] is a matter of normative judgment, and the criteria lack rigid simplicity.... [No] one fact can function as a necessary condition across the board ... nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason...." *Brentwood,* 531 U.S. at 295–96, 121 S.Ct. 924. Because of the fact-intensive nature of the inquiry, courts have developed a variety of approaches to the State actor issue. *See id.* at 296, 121 S.Ct. 924(listing seven approaches to the issue including the coercion test, the joint action test, the public function test, and the entwinement test).

Previously, we expressed uncertainty as to whether satisfaction of a single test could be sufficient to establish that a private entity was a State actor. *See, e.g., George v. Pacific CSC Work Furlough,* 91 F.3d 1227, 1230 (9th Cir.1996) (per curiam); *Gorenc v. Salt River Project Agric. Improvement & Power Dist.,* 869 F.2d 503, 506 (9th Cir.1989). However, in *Brentwood,* the Court determined that the nominally private entity whose conduct was challenged was a State actor solely on the basis that the entity was entwined with the State. The Court held that satisfaction of this single test was sufficient, so long as no countervailing factor existed. *See Brentwood,* 531 U.S. at 304 ("When ... the relevant facts show pervasive entwinement ..., the implication of state action is not affected by pointing out that the facts might not loom large under a different test.").[3]

Applying this same logic here, the plaintiffs argue that the OAC is a State actor under both the public function test and what they label the "nexus" test. Because we agree with the plaintiffs that in regulating free speech within the Commons the OAC performs an exclusively and traditionally public function within a public forum, we focus only upon the public function test. *See id.* We therefore do not reach the plaintiffs' argument that the OAC is a State actor under what they label the "nexus" test.[4]

■■■ Under the public function test, "when private individuals or groups are endowed by the State with powers or func-

---

**3.** Even the four dissenting Justices in *Brentwood,* who disagreed with the majority's conclusion that entwinement alone could establish a private entity as a State actor, employed a disjunctive analysis to the tests they would apply to determine whether a private entity is a State actor. *See id.* at 305, 309–11, 121 S.Ct. 924 (Justice Thomas dissenting, joined

by Chief Justice Rehnquist and Justices Scalia and Kennedy).

**4.** We note, however, that in *Brentwood* the Court treated "nexus" as a status that is found in all cases where private action is attributable to the State, whether that attribution is made under the "pervasive entwinement" test upon which the Court relied in

tions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). To satisfy the public function test, the function at issue must be both traditionally and exclusively governmental. *Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

■■■ The particular public function that the plaintiffs allege the OAC performed was the regulation of free speech within the Commons, a public forum.[5] Previous courts have found this function to be a traditional and exclusive public function. For example, in *Marsh v. Alabama,* 326 U.S. 501, 505–06, 66 S.Ct. 276, 90 L.Ed. 265 (1946), the Court examined whether a company that regulated speech in a shopping district in its privately owned town became a State actor. The Court concluded that it did. The Court explained that "the town and its shopping district are accessible to and freely used by the public in general and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the property belongs to a private corporation." *Id.* at 503, 66 S.Ct. 276. Given that circumstance, the fact that the property is private "is not sufficient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties." *Id.* at 509, 66 S.Ct. 276. "Ownership does not always mean absolute dominion.... [Where] facilities are built and operated primarily to benefit the public ... their operation is essentially a pub-

lic function ... subject to state regulation." *Id.* at 506, 66 S.Ct. 276; *see also Citizens To End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.,* 745 F.Supp. 65(D.Mass.1990) (holding that a private corporation's regulation of free speech activities on publicly owned land leased by the corporation was a public function, where that land was a public forum over which the public held an easement).

Although not a free speech case, *Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), is also instructive because it involved the management by private trustees of a city-owned park that previously had been managed by the city. In that case, the Court rejected the argument that the transfer of the park to nominally private control meant that the trustees were not performing a public function. The Court held, after examining the history and use of the park, that "the public character of this park requires that it be treated as a public institution subject to the command of the Fourteenth Amendment, regardless of who now has title under state law." *Id.* at 302, 86 S.Ct. 486.

Here, the Commons functions as a freely accessible public forum through which people pass on their way to shows, concerts, games, and restaurants. The Commons is also a gathering place for public events. Just three days after this case was argued, three thousand people gathered at the Commons for a multi-faith service that was Oregon's largest public event in response to the September 11, 2001 "Attack on America." *See* Courtney Thompson, Betsy Hammond, and Erin H. Barnett, *Oregoni-*

---

*Brentwood,* or the public function test upon which we rely today. *See id.* at 295–96, 121 S.Ct. 924; *see also Blum v. Yaretsky,* 457 U.S. 991, 1005, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) ("[T]he required nexus may be present if the private entity has exercised powers that are 'traditionally the exclusive prerogative of

the State.'") (quoting *Jackson,* 419 U.S. at 353, 95 S.Ct. 449).

**5.** It is important to identify the function at issue because "[a]n entity may be a State actor for some purposes but not for others." *George,* 91 F.3d at 1230.

*ans Find Comfort, Strength in Many Faiths,* The Oregonian, Sept. 15, 2001, at D1. Moreover, as we have noted, the character of the Commons as a public forum is conceded by the OAC.[6] Thus, the regulation of speech in the Commons is a public function and the OAC became a State actor when the City delegated that regulation to the OAC.

We do not hold that everyone who leases or obtains a permit to use a state-owned public forum will necessarily become a State actor. We agree with the Sixth Circuit that, for example, a street festival organizer given non-exclusive powers over a traditional public forum does not, in the absence of other facts, become a State actor when the State maintains the ultimate power to regulate activities in the forum. *See Lansing v. City of Memphis,* 202 F.3d 821, 828–29 (6th Cir.2000) ("[A]lthough [the street festival organizer] had permission from the city to put its streets to special use during the time of the festival, the city retained ultimate control of the streets at all times."). Here, however, Portland retained little, if any, power over the OAC's free speech policies governing the Commons. The OAC's functionally exclusive regulation of free speech within the Commons, a public forum, is a traditional and exclusive function of the State.

The OAC argues it is not a State actor because, unlike in *Faneuil Hall,* 745 F.Supp. at 71, no public easement exists through the Commons. The absence of such an easement, however, does not control our analysis, given the reality that the

Commons is a public forum. *See Marsh,* 326 U.S. at 505 n.2, 66 S.Ct. 276 (determination of State court that company town was not "dedicated" under law to public use "does not decide the question under the Federal Constitution" whether company town is a State actor); *Brentwood,* 531 U.S. at 301 n. 4, 121 S.Ct. 924 (noting that the State actor determination often emphasizes practical reality over legal formalities). It is the function of the OAC's administration of the Commons that guides and informs our inquiry, not the precise legal arrangement under which the OAC leases the area. That "function" is the administration of free speech rules within a public forum. *Cf. West v. Atkins,* 487 U.S. 42, 55–56, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (contract physician is a State actor even though not a State employee because "[i]t is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State").

The OAC asserts that the policing of the Commons is not an exclusive public function, citing *Wade v. Byles,* 83 F.3d 902, 904–06 (7th Cir.1996). In *Wade,* the Seventh Circuit held that a private security guard was not a State actor because, even though his exercise of limited police powers over a public housing project was a traditional public function, it was not an exclusively public one. The present case, unlike *Wade,* does not turn on whether the use of limited police powers on public land is a public function. It turns on what is

---

**6.** The character of the Commons as a public forum was also confirmed in the OAC's former lease. That lease required the OAC to "permit access to and free speech on the [Commons] as may be required by laws." Even without this former lease provision, however, so long as the Commons is a public forum, constitutional protections of free speech within it may not be altered simply because the City has disassociated itself from

the OAC's policymaking activities. *Cf. Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (silence of lease as to private restaurant's duty to obey Fourteenth Amendment is not decisive because "no State may effectively abdicate its [Constitutional] responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be.").

quintessentially an exclusive and traditional public function—the regulation of free speech within a public forum.

We conclude that, in regulating speech within the Commons, the OAC performs an exclusively and traditionally public function within a public forum. "[T]here being no offsetting reason to see the [OAC's] acts in any other way," *Brentwood*, 531 U.S. at 291, 121 S.Ct. 924, we need not consider whether the implication of State action would be affected by other facts that "might not loom large under a different test." *Id.* at 303, 121 S.Ct. 924. In regulating free speech within the Commons, the OAC is a State actor.

### III

 The OAC's status as a State actor does not end this case, but it does, for the moment, end this court's inquiry. The OAC may still "impose reasonable restrictions on the time, place, or manner of protected speech [within the Commons], provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). The district court did not reach this question, which involves a factual inquiry best undertaken by that court.

On remand, the district court shall determine whether any or all of the OAC's free speech policies and procedures are reasonable time, place, and manner restrictions. Although the district court will, of course, separately evaluate all challenged aspects of the OAC's policies and procedures, we draw its attention in partic-

ular to the need for further factfinding as to the reasonableness of: (1) the noise limits imposed by the OAC; (2) the rule banning the wearing of sandwich boards; and (3) the designation of limited free speech zones, including both the policy in general and its specific provisions identifying the size, location, and number of such zones. We express no opinion on the merits of these issues.

REVERSED and REMANDED.