**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GEORGE VILLEGAS; BOB POELKER;
MARCELO ORTA; DON DEROSIERS,
     *Plaintiffs-Appellants,*

v.

GILROY GARLIC FESTIVAL
ASSOCIATION; D. BERGMAN, Officer;
CITY OF GILROY,
     *Defendants-Appellees.*

No. 05-15725

D.C. No.
CV-01-20720-JW

OPINION

Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, Presiding

Argued and Submitted
December 11, 2007—Pasadena, California

Filed September 3, 2008

Before: Alex Kozinski, Chief Judge,
Diarmuid F. O'Scannlain, Pamela Ann Rymer,
Sidney R. Thomas, M. Margaret McKeown,
Kim McLane Wardlaw, Raymond C. Fisher,
Ronald M. Gould, Richard A. Paez, Consuelo M. Callahan,
and N. Randy Smith, Circuit Judges.

Opinion by Judge O'Scannlain;
Dissent by Judge Thomas;
Dissent by Judge Gould

12057

**COUNSEL**

Randolph M. Hammock, Law Offices of Richard M. Lester, Canoga Park, California, argued the cause for the plaintiffs-appellants; Allen Lichtenstein, General Counsel and Lee Rowland, Staff Attorney, ACLU, Las Vegas, Nevada, were on the briefs.

Bronwen Lacy, Strombotne Law Firm, San Jose, California, and Gregory C. Simonian, Clapp Moroney Bellagamba and Vucinich, Daly City, California, argued the cause for the defendants-appellees; Mark Strombotne, Strombotne Law Firm, San Jose, California, G. Martin Velez, Clapp Moroney Bellagamba and Vucinich, Daly City, California, and Valerie S. Higgins, Clapp Moroney Bellagamba and Vucinich, San Bruno, California, were on the briefs.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether guests at the Gilroy Garlic Festival can hold the City of Gilroy in California and the Gilroy Garlic Festival Association liable in a civil rights action when they are escorted from the event by a City police officer for violating the Festival's dress code.

I

George Villegas and remaining plaintiffs (hereinafter "Top

Hatters"), all of whom are members of the Top Hatters Motorcycle Club, brought suit against the City of Gilroy and the Gilroy Garlic Festival Association ("GGFA") under 42 U.S.C. § 1983 for alleged violations of their civil rights arising out of events occurring at the Gilroy Garlic Festival on July 30, 2000. On that occasion they were wearing vests that included an image of a skull with wings and a top hat with the words "Top Hatters" above the top hat and the word "Hollister" written below.[1] Pursuant to an unwritten policy of the GGFA that prohibited guests from wearing "gang colors or other demonstrative insignia, including motorcycle club insignia," the Festival's chair of security, an off-duty police officer, requested an on-duty police officer to remove the Top Hatters and this litigation ensued.

The district court granted summary judgment in favor of both the City of Gilroy and the GGFA, ruling that wearing such vests was neither expressive conduct nor expressive association within the protection of the First Amendment and that in any event the GGFA was not a state actor within the meaning of section 1983. *Villegas v. City of Gilroy*, 363 F. Supp. 2d 1207, 1208-09, 1211, 1217-19 (N.D. Cal. 2005).

On the Top Hatters' appeal, a three-judge panel affirmed, holding that the motorcycle club insignia was subject to expressive conduct analysis but that there was no First Amendment violation; it failed to reach the state action issue. *See Villegas v. City of Gilroy*, 484 F.3d 1136, 1140 (9th Cir.), *withdrawn*, 503 F.3d 974 (9th Cir. 2007).

Thereafter, a majority of the circuit judges in active service ordered that this case be heard en banc pursuant to Rule 35(a)

---

[1]The Top Hatters attended the Gilroy Garlic Festival to celebrate member Bob Poelker's birthday sporting their Top Hatters Motorcycle Club vests. These vests are made of either blue denim or black leather, and are adorned with various patches and pins that indicate membership in the Top Hatters.

of the Federal Rules of Appellate Procedure. *Villegas*, 503 F.3d at 974.

## II

Before dealing with the Top Hatters' contentions, a more detailed recital of the uncontroverted facts offered in support of summary judgment is appropriate.

Once a year, for a few days in the summer, GGFA, a private non-profit corporation, sponsors and runs the Gilroy Garlic Festival. The Festival offers food, contests, music, and family recreation activities—with an emphasis on garlic—in a family-friendly environment. Such attractions include the Great Garlic Cook-Off cooking contest and Gourmet Alley, where garlic-laced calarmari and scampi, garlic chicken stir fry, garlic sausage sandwiches, and garlic bread are served. Magicians, dance troupes, puppets and jugglers offer entertainment geared toward children in a special area.

The Festival at issue was held in Christmas Hill Park, a public park in the City of Gilroy, from July 28 to July 30, 2000. In order to secure this venue, GGFA entered into a facility reservation contract with the City. Under the terms of this agreement, GGFA was required to "understand and agree that security and traffic control may be required by the Gilroy Police Department."

GGFA itself has a chair of security and an assistant chair of security, who are unpaid volunteers, one of whom is usually a law enforcement officer with the City of Gilroy Police Department or another local law enforcement agency. At the conclusion of the Festival, the City of Gilroy Police Department typically submits a bill to GGFA for expenses incurred in providing its law enforcement officers to staff the Festival.

GGFA had an informal dress code in place; however, as the Top Hatters point out, at the time of the incident, there was

no written policy in existence, nor was there one posted. According to the alleged dress code, persons wearing clothing with gang colors or insignia were allowed to remain at the Festival only if they removed such clothing. Individuals refusing to remove clothing with gang colors or insignia were not permitted to remain at the Festival. Such policy was adopted as a response to an increase in gang-related violence at the Festival in prior years which had negatively impacted attendance. The dress code was not applied to the area outside the Festival.

As the Top Hatters entered the Festival sporting their vests, off-duty Gilroy Police Sergeant Donald Kludt, GGFA's chair of security, dressed in plain clothes, spotted them, contacted Gilroy Police Officer Brenda Bergman, and requested that she escort the Top Hatters back to the gate. Officer Bergman was armed and uniformed and assigned to Festival security. In his deposition, Sergeant Kludt explained why he contacted Officer Bergman for assistance:

Q: Was it the fact that she [Officer Bergman] was an armed uniformed officer, was that part of your thought process in wanting her to be with you?

A: Yeah.

Q: Because you were not armed; correct?

A: Correct.

Q: And you were not uniformed; correct?

A: Correct.

Q: And you wanted Officer Bergman to assist you because she would give some air of authority as a police officer; correct?

[Objection]

Q: Would that be a fair statement?

A: Yes.

Officer Bergman duly approached the Top Hatters and requested that they follow her to the gate and they complied. Once they arrived there, Sergeant Kludt explained GGFA's dress code policy to them: "I told them that if they refused to remove their [gang] colors and enjoy the festival that we will ask them to leave and then we will refund their money, their entry fee into the festival." The Top Hatters, however,

> felt that this was not right, that they had their rights to wear their vests where they wanted to and this was not right. And I [Sergeant Kludt] told them: Well, I have a policy and I'm enforcing this policy and I'm asking you to leave if you're choosing not to, you know, come into the festival without your colors.
>
> So they left. And then I walked around with them, went to the ticket booth and ordered those people to refund these people their money.

Q: Where was Officer Bergman at the time?

A: Standing next to me.

The Top Hatters challenge on appeal the district court's grant of summary judgment, asserting that there were genuine issues of material fact as to whether GGFA was a state actor and whether the Top Hatters were engaged in protected expressive conduct or expressive association. The Top Hatters also assert that the City was liable for enforcing an unconstitutional dress code which it had impliedly adopted.

### III

**[1]** Under familiar principles, even a private entity can, in certain circumstances, be subject to liability under section 1983. *See Sutton v. Providence St. Joseph Medical Ctr.*, 192 F.3d 826, 835-36 (9th Cir. 1999). In *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982), the Supreme Court created a two step analysis for determining whether or not there was state action by a private actor sufficient to establish liability for a constitutional tort. The first inquiry was "whether the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority." *Id.* at 939. The second was "whether, under the facts of this case, . . . [the] private parties, may be appropriately characterized as 'state actors.' " *Id.* In *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), the Court introduced a multi-factored test. *Id.* at 295-300. The inquiry is a general one: "[S]tate action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.' " *Id.* at 295 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)). Some of the factors to consider in determining whether there is a "close nexus" are: (1) the organization is mostly comprised of state institutions; (2) state officials dominate decision making of the organization; (3) the organization's funds are largely generated by the state institutions; and (4) the organization is acting in lieu of a traditional state actor. *See id.* at 295-99.

The Top Hatters argue that there is a sufficiently "close nexus" between the GGFA and the City of Gilroy and point to the following facts in support of its contention:

> 1.　The festival is held in a public park, owned by the City of Gilroy;
>
> 2.　The City of Gilroy issued a written permit to the GGFA which is signed by all of the city council

members, and which *requires*, in part, that the City of Gilroy provide some of its police officers as security for the festival;

3.   The City of Gilroy submits a bill to the GGFA for the use of its police officers;

4.   The "chair of security" for the GGFA is typically a police officer with the City of Gilroy Police Department;

5.   At the time of the incident, this "chair of security" for the GGFA was Sergeant Kludt, an active member of the City of Gilroy Police Department; and

6.   Sergeant Kludt utilized the command post of the Gilroy Police Department at the festival grounds.

We are not persuaded. The Fourth Circuit's opinion in *United Auto Workers v. Gaston Festivals, Inc.*, 43 F.3d 902 (4th Cir. 1995), is instructive. In *Gaston*, the UAW was denied a booth at a festival run by Gaston Festivals, Inc., "a private, non-profit corporation that organizes and promotes the Fish Camp Jam, an annual festival held in downtown Gastonia, North Carolina." *Id.* at 904. The festival was "held on public streets and sidewalks and on private property in Gastonia's downtown area." *Id.* Just like GGFA, Gaston had to "obtain a permit in order to use the public property during the festival . . . . In addition to approving the permit, the City provide[d] police protection, traffic department assistance, and sanitation services during the . . . event." *Id.* In addition, the City actually donated $10,000 to the Fish Camp Jam. *Id.* at 904-05.

The court in *Gaston* determined that "[t]he organization, management, and promotion of events such as the [festival] do not fall within the domain of functions exercised tradition-

ally and exclusively by the government." *Id.* at 907-08. Additionally, the court noted that "[t]he Supreme Court has expressed doubts that, as a general matter, 'the operation of a park for recreational purposes is an exclusively public function,' particularly in light of 'the experience of several American entrepreneurs who amassed great fortunes by operating parks for recreational purposes.' "[2] *Id.* at 908 (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 159 n.8 (1978) and citing *NCAA v. Tarkanian*, 488 U.S. 179, 197-98 n.18 (1988) (holding that the coordination of amateur sports is "by no means . . . a traditional, let alone an exclusive, state function")).

The UAW also made the argument that Gaston Festivals was a state actor because the City had given control of its town center to the festival, which the court rejected because it determined that to find state action, "[a] private actor must assume plenary control and complete governmental power over the property in question." *Id.* at 909 (citing *Marsh v. Alabama*, 326 U.S. 501, 506 (1946); *Hudgens v. NLRB*, 424 U.S. 507, 519 (1976)). The court noted that while the City required a permit and provided essential services such as security to support the festival, the City did not thereby relinquish control of the public areas. *Id.*

**[2]** Applying similar principles here, we conclude that GGFA is not a state actor. First, running festivals is not a traditional municipal function. Second, just as in *Gaston*, the City of Gilroy required a permit, showing that the City retained control of the park and provided security services. Unlike in *Gaston*, where the City actually contributed money to the festival, the City of Gilroy billed the GGFA for its security services. There is even less connection between Gilroy and GGFA than between the city and the festival in *Gaston*.

---

[2]Additionally, we have required that for a private actor to be considered a state actor under a "public function test, the function at issue must be both traditionally and *exclusively* governmental." *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002) (emphasis added).

**[3]** Nevertheless, the Top Hatters rely upon *United States v. Davis*, 482 F.2d 893, 901-04 (9th Cir. 1973), *overruled on other grounds by United States v. Aukai*, 497 F.3d 955, 960-61 (9th Cir. 2007) (en banc). There, we held that when private security guards implemented an airport security program ordered by the President of the United States, they were engaging in a predominately government function and that the federal government was the dominant actor. *Davis*, 482 F.2d at 901-04. Unlike *Davis*, there is no showing here that security activity is a dominant or even a major purpose of the GGFA. Furthermore, there is no indication in the record that the City of Gilroy plays a dominant role in controlling the actions of the organization or the content of the festival.[3]

---

[3]*Collins v. Womancare*, 878 F.2d 1145 (9th Cir. 1989), on which the dissent relies, does not counsel otherwise. Dissent at 12075-76, 12080-81. First, there is no evidence that the City or the police department played any part in drafting the dress code or any other aspect of the Festival. Police were required to be present to provide security, a legitimate state interest when such a large crowd is gathered. *See Berger v. Hanlon*, 129 F.3d 505, 514 (9th Cir. 1997), *rev'd on other grounds*, 526 U.S. 808 (1999) (per curiam), *opinion reinstated*, 188 F.3d 1155 (9th Cir. 1999). Here, unlike in *Berger* where there was "a written contractual commitment between the government and the media to engage jointly in an enterprise that only the government could lawfully institute—the execution of a search warrant," maintaining security is not something only the government could lawfully institute. *Id.*

Second, although the dissent focuses on the "neutrality" of the officers in *Womancare*, here, unlike in *Womancare* where police "neutrality" was of greater importance due to the general right of anyone to protest on a sidewalk, a person does not have a general right to wear attire of their choosing to a privately run festival. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 579 (1995) (recognizing right of parade organizers to exclude unwanted participants despite its "use of the streets").

Third, the additional factors that the dissent lists to suggest "joint action," including the percentage of the citizens of Gilroy working at the festival, the increased income generated, and "the assistance and involvement of the City's Engineering Division, Building & Safety Division, Fire Department, Chemical Control Division, and Police Department," could

Following the reasoning of *Gaston*, we are satisfied that GGFA was not a state actor for purposes of section 1983 liability.[4]

IV

**[4]** The Top Hatters also contend that the City of Gilroy is liable under *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978), for violating their First Amendment rights by enforcing the GGFA dress code. But it is generally not a constitutional violation for a police officer to enforce a private entity's rights. As the district judge noted in this case, and we agree, if the ability "to exclude others from public property during the course of a limited, permitted use" were found to be a constitutional violation, "[e]very picnic, wedding, company outing, meeting, rally, and fair held on public grounds would be subject to constitutional scrutiny." *Villegas*, 363 F. Supp. 2d at 1216. Because there is no constitutional violation, there can be no municipal liability.

---

apply equally to the building of a new fertilizer plant, but that would not make the construction of such plant state action. Dissent at 12076. Moreover, the large increase in visitors from afar highlights that the main concern of the City in maintaining a police presence was public safety, not a share in the financial success of the Festival.

[4]The dissent finds fault with our conclusion of state action, stating that we "consider[ ] only the 'governmental function' test." Dissent at 12074. But, it is clear from our analysis that we consider not only whether a festival is a traditional state function but also factors such as the level of control the City has over the festival, the level of financial contribution of the City to the festival, etc. *See Brentwood Academy*, 531 U.S. at 295-99 (emphasizing that federal courts should apply a flexible multi-factor analysis when determining whether the action of a private actor is really state action for purposes of the Fourteenth Amendment). Moreover, the dissent's approach seems to be internally inconsistent, noting that there is "no specific formula for defining state action" but then stating that we must apply "four distinct—but not mutually exclusive—tests." Dissent at 12074; *see also Brentwood Academy*, 531 U.S. at 295-99 (describing the "four distinct . . . tests" referred to by the dissent in this case as simply factors that may be considered in a flexible approach to state action).

**[5]** But even if there were a constitutional violation, the Top Hatters cannot establish municipal liability under the *Monell* standard. In *Monell*, the Supreme Court held that a local government may indeed be liable for violation of constitutional rights resulting from "a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers" or "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." 436 U.S. at 690-91.

**[6]** Generally, a municipality is liable under *Monell* only if a municipal policy or custom was the "moving force" behind the constitutional violation. *See Galen v. County of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007). In other words, there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Furthermore, it is not enough to "merely [to] alleg[e] that the existing . . . program . . . represents a policy for which the city is responsible." *Id.* at 389.

**[7]** Here, the Top Hatters point to the fact that the permit requires that the City's police provide a portion of the Festival's security, that the City is reimbursed for providing such security, and that Officer Bergman complied with the request of the GGFA's chair of security to remove individuals who did not comply with GGFA's dress code.[5] None of these facts gives rise to the conclusion that the City had a policy or custom of enforcing GGFA's dress code. Furthermore, there is no evidence in the record of a custom or official policy of the

---

[5]Although the GGFA chair of security was a police officer, there is no showing that he was acting other than in his private capacity as the GGFA chair of security. Furthermore, there is no evidence presented by the Top Hatters that Officer Kludt was required to be the chair of security by City policy or custom, or that the GGFA was required by the City to name a police officer as its chair of security.

City to enforce the GGFA's dress code, nor is there evidence that Gilroy officials participated in forming the dress code.

V

In light of the foregoing we do not reach the question of whether wearing the Top Hatters clothing and insignia constituted expressive conduct.

**AFFIRMED.**

THOMAS, Circuit Judge, with whom Circuit Judges WARDLAW, FISHER, and PAEZ join, dissenting, and with whom Circuit Judge GOULD joins in part:

Gilroy holds itself out as the "Garlic Capital of the World," and no one seriously disputes the claim. In celebration of its status, and recognizing that eating garlic is inevitably a shared experience, Gilroy hosts an annual Garlic Festival in late July. It is not a small affair. Approximately 120,000 visitors participate annually, and more than three million revelers have attended the festival since its inception. Disregarding the Bard's admonition,[1] the festival features "food laced with over two tons of garlic." It is, according to the promotional materials, a "fun and fragrant" experience, with participants "going bananas over garlic." The festival is sponsored and managed by the non-profit Gilroy Garlic Festival Association ("Festival Association").

Members of the Top Hatters Motorcycle Club, Inc., a non-profit charitable corporation, were expelled from the 2000 Festival for wearing vests bearing their corporate insignia—

---

[1]"And, most dear actors, eat no onions nor garlic, for we are to utter sweet breath." William Shakespeare, *A Midsummer Night's Dream*, act 4, sc. 2.

thereby violating the Festival Association's unwritten dress code. The Top Hatters filed suit against the City of Gilroy ("City"), the officer enforcing the dress code, and the Festival Association. The district court concluded that genuine issues of material fact existed as to whether the City's involvement constituted state action, but held that the wearing of the vests did not constitute expressive conduct violative of the First Amendment. The district court granted summary judgment as to the Festival Association on the basis that it was not a state actor. A three-judge panel of this court affirmed the grant of summary judgment on the ground that the Top Hatters had not engaged in protectable expressive conduct. We granted rehearing en banc to reconsider the panel's decision and ordered that the panel opinion be designated as non-precedential and non-citable. The majority has declined to reach the First Amendment question, but has elected to hold that neither the Festival Association nor the City was engaged in state action. The evidence, viewed in the light most favorable to the Top Hatters, demonstrates that there are genuine issues of fact precluding summary judgment. Therefore, I respectfully dissent.

I

Genuine issues of material fact preclude summary judgment as to the Festival Association. As the majority notes, it is a well-established principle that a private entity can be subject to liability as a state actor under certain circumstances. *See, e.g.*, *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 724-25 (1961) (holding that a privately owned restaurant that leased property from a state-owned parking facility was a state actor). The ultimate question is whether "the conduct allegedly causing the deprivation of a federal right" is "fairly attributable to the [s]tate." *Lugar v. Edmondson Oil Co. Inc.*, 457 U.S. 922, 937 (1982).

In deciding whether conduct of private parties amounts to government action, we engage in a highly factual inquiry.

*Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983). While " 'there is no specific formula for defining state action,' " *id.* (quoting *Melara v. Kennedy*, 541 F.2d 802, 805 (9th Cir. 1976)), we have traditionally evaluated whether a private actor has engaged in state action by relying on four distinct—but not mutually exclusive—tests: (1) the governmental nexus test, *see Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974) (courts must consider whether there is a "sufficiently close nexus between the [s]tate and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the [s]tate itself"); (2) the public or governmental function test, *see id.* at 352 (state action is present when a private entity exercises functions traditionally and exclusively reserved to the state); (3) the state compulsion test, *see Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("a [s]tate normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [s]tate"); and finally, (4) the joint action test, *see Dennis v. Sparks*, 449 U.S. 24, 27 (1980) (private actors can be considered state actors if they are "willful participant[s] in joint action with the [government] or its agents"). Satisfaction of any one of these tests can be sufficient to find state action. *See Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 303 (2001); *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002).

Rather than applying the established four test analysis, the majority, relying on a single case from the Fourth Circuit, considers only the "governmental function" test, and ends its inquiry there. However, unlike the plaintiffs in *United Auto Workers v. Gaston Festivals, Inc.*, 43 F.3d 902 (4th Cir. 1995), the Top Hatters do not rest their argument on the governmental function test. Thus, by relying solely on *United Auto Workers* and narrowing its focus to just the single test considered therein, the majority has set up a straw man to prove what we already know: the Festival Association, in

organizing a festival to promote and celebrate garlic, was not likely performing a function that is "traditionally the *exclusive* prerogative of the [s]tate." *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) (internal quotation marks omitted). The Top Hatters do not argue that it was, and the Festival Association allots only three sentences of its brief to affirm this common sense point. Unfortunately, in limiting its analysis to whether organizing a garlic festival is an exclusive governmental function, the majority ignores both the ultimate state action inquiry and the Supreme Court's traditional means of answering that question: "tak[ing] a flexible approach . . . [and] applying a variety of tests to the facts of each case." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995); *see also Brentwood Acad.*, 531 U.S. at 296 (noting that a "host of facts" can bear on whether action is fairly attributable to the state and describing numerous tests used by the Supreme Court).

In this case, the test that most reasonably applies to the Festival Association's relationship with the City is the "joint action" test. Under this test, the Top Hatters have demonstrated that a triable issue of material fact exists as to whether the Festival Association's actions are "fairly attributable to the [s]tate." *Lugar*, 457 U.S. at 937.

Joint action "exists where a private party is 'a willful participant in joint action with the [s]tate or its agents.' " *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989). The lynchpin of a finding of "joint action" is the existence of "a substantial degree of cooperative action." *Id.* Joint action exists when the government "has 'so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity.' " *Id.* (alteration in original). Thus, the joint action test will be satisfied when the actions of the state and the private party are intertwined or when the parties have a symbiotic relationship. *See Brentwood Acad.*, 531 U.S. at 298-99.

Viewing the evidence in the light most favorable to the Top Hatters, as we are required to do here—a standard the majority fails to mention, let alone apply—demonstrates that the relationship between the City and the Festival Association is sufficiently intertwined to create a triable issue of fact as to whether the joint action test has been satisfied.

First, the festival is not an intimate, private gathering. It is the largest event of the year in Gilroy. As the district court noted, the population of Gilroy expands five-fold during the festival, with the concomitant significant impact on the local economy. Over 4,000 community volunteers—over ten percent of the citizens of Gilroy—work in some capacity at the festival. For the duration of the festival, it engulfs the City. In order to administer this mammoth event safely, the festival required the assistance and involvement of the City's Engineering Division, Building & Safety Division, Fire Department, Chemical Control Division, and Police Department. In other words, the very nature of the festival requires significant intertwining of resources between the City and the Festival Association.

Second, the presence of an agreement between the government and the private party is also a significant factor in applying the joint action test. "The Supreme Court has said [the joint action test] is satisfied when the plaintiff is able to establish an agreement, or conspiracy between a government actor and a private party." *Berger v. Hanlon*, 129 F.3d 505, 514 (9th Cir. 1997) (*citing Dennis*, 449 U.S. at 27-28), *rev'd on other grounds*, 526 U.S. 808 (per curiam), *opinion reinstated*, 188 F.3d 1155 (9th Cir. 1999).

In this case, as a condition of the use of the property, the City required the Festival Association to apply for and receive a special event permit. As one of the conditions for receiving the permit, the City required the Festival Association to staff the festival with City police officers and to reimburse the City for the expense. The number of personnel deployed was to be

negotiated between the Festival Association and the City, although the City generally provided twenty-five percent of the festival's security force. These police officers were considered to be on duty and working within the course and scope of their employment with the City while stationed at the festival.

Third, participation of state actors in the private association is an indicia of joint action. *See Brentwood Acad.*, 531 U.S. at 298 (examining composition of the membership of a private athletic association in holding it was a state actor). By tradition, the head of security for the Festival Association was a member of the City police force. The 2000 festival was no exception. In the year in question, the head of security for the Festival Association was City Police Sergeant Donald Kludt.

Fourth, although the City's police officers acted within the course and scope of their employment with the City when deployed at the festival, the officers took orders from the Festival Association with respect to enforcing the Festival Association's dress code. Before the 2000 festival, City police officers attended briefings as to the parameters of the dress code and were instructed to exclude persons wearing "group clothing that could inspire conflict," as Gilroy City police officer Brenda Bergman testified.

Officer Bergman, the City police officer who participated in removing the Top Hatters from the festival, testified that Sergeant Kludt was her direct supervisor during the course of her regular employment with the City. Bergman also testified that during the festival, when Sergeant Kludt was serving as head of security, she would take directions from him either in his capacity as her direct supervisor or in his capacity as security chief for the Festival Association.

These facts alone create a triable issue of fact as to whether the substantial cooperation that existed between the City and the Festival Association with respect to the dress code consti-

tuted joint action. However, the specifics of the encounter at issue also provide evidence of substantial cooperation and the intertwining of the City and the Festival Association.

We have previously considered the circumstances in which a police officer's involvement in a private enforcement action constitutes state action such that the private entity is liable in a line of cases involving police presence at private vehicle repossessions and evictions. *See, e.g.*, *Meyers v. Redwood City*, 400 F.3d 765 (9th Cir. 2005); *Howerton*, 708 F.2d 380; *Harris v. City of Roseburg*, 664 F.2d 1121 (9th Cir. 1981). These cases teach us that "[w]hile mere acquiescence by the police to 'stand by in case of trouble' is insufficient to convert" a private enforcement action into one attributable to the state, "police intervention and aid . . . does constitute state action." *Harris*, 664 F.2d at 1127. Even mere assistance in effectuating an enforcement action or the intimidation of a person so "as to cause him to refrain from exercising his legal right to resist" will support a finding of state action. *Id.*

In *Harris*, we found state action where a man holding a security interest in a semi-tractor requested two officers to accompany him while he attempted to repossess the semi-tractor. *Id.* at 1124. When Harris, the owner of the truck, confronted his creditor, one of the officers "stepped in and told Harris to 'stand back or get away.' " *Id.* In response to Harris's question about what was happening, the officer explained that the creditor had come to repossess the truck, and that he, the officer, " 'came out to stand by.' " *Id.* Harris testified that the officer told him that if he interfered in any way, he would be taken to jail, and that if the officers had not been present, he would have physically resisted the repossession. *Id.* at 1127. Concluding that an officer's assistance or intimidation is sufficient to constitute state action, we held that the officer's conduct had converted the repossession in *Harris* into state action. *Id.*

As in *Harris*, here Officer Bergman did more than merely "stand by in case of trouble": she actively assisted Kludt in

enforcing the Festival Association's unwritten dress code policy. First, Bergman, at Kludt's direction, approached the Top Hatters and ordered them to follow her to the festival's entrance gate. According to plaintiff Donald Desrosiers, he obeyed Bergman precisely because she was clearly an officer: "when a police officer comes up and says follow you, you follow them. That's the nature of the law. . . . It felt threatening." Kludt asked Bergman to approach the Top Hatters precisely because he was hoping for that effect—as an armed, uniformed officer, Kludt believed Bergman "would give some air of authority" to his request that the Top Hatters remove their vests or leave the festival.

Moreover, at least one of the Top Hatters testified that it was Officer Bergman who first informed the Top Hatters of the festival's dress code policy, and indicated that if they refused to remove their "colors," they would have to leave the festival. Sergeant Kludt then joined Bergman and the Top Hatters at the festival's gate, where he repeated Bergman's ultimatum. Plaintiff Marcelo Orta, Jr. recalled that Officer Bergman supported Kludt by telling the Top Hatters they were a gang and that they "just needed to leave, that they didn't want our kind there." Finally, once the Top Hatters had received their refunds, other uniformed Gilroy police officers escorted the plaintiffs to their bikes. Those officers also echoed Kludt and Bergman, saying, "All you have to do is take your patch off, you can go back in."

Officer Bergman and other uniformed Gilroy police officers actively assisted Sergeant Kludt in enforcing the Festival Association's dress code by requesting that the plaintiffs follow Bergman, demanding that they remove their vests, and lending Kludt's own statements "an air of authority." Moreover, at least two of the Top Hatters testified that they knew Kludt himself to be a Gilroy police officer, as he identified himself to them as such and wore a badge. These actions meet *Harris*'s standard for state action—Officer Bergman and the other Gilroy officers did more than merely stand by in case

of trouble—they actively aided Kludt in enforcing the Festival Association's dress code.

Our decision in *Womancare* also supports the conclusion that the Festival Association's actions are fairly attributable to the state. *See* 878 F.2d 1145. In *Womancare*, we held that a group of anti-abortion protestors had failed to satisfy the joint activity test for state action when employees of a woman's health center performed citizens' arrests on protestors whom they believed were violating an injunction. *Id.* at 1155. While we noted that there "the impetus for the arrests" came from the health center's employees, not from the police, we emphasized the independence of the police officers. *Id.* at 1155-56 ("In short, there is no indication in the record that state agents failed to use independent judgment . . . .").

In *Womancare*, the employees first attempted to serve the protestors with the injunction, and when that effort failed, they called the police. *Id.* at 1146. Once a police officer had arrived on the scene, the officer conducted "an independent investigation" and then "refused . . . to arrest the protestors on his own authority." *Id.* at 1155. Additionally, we noted that the protestors had not alleged any facts to contradict the employees' contention that the "police maintained a policy of neutrality in the dispute." *Id.* The plaintiffs had "presented no evidence from which [the] court could infer 'a prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police.' " *Id.* (quoting *Carey v. Continental Airlines, Inc.*, 823 F.2d 1402, 1404 (10th Cir. 1987)).

Here, while the impetus for removing the Top Hatters from the festival also came from the private party and not the state, Sergeant Kludt enlisted Officer Bergman's aid from the beginning. Rather than calling for police assistance *after* approaching the plaintiffs as the employees in *Womancare* did, here Kludt asked Bergman to make the initial contact with the Top Hatters. He relied on her "air of authority" to

escort them out of the festival without a confrontation. More-over, Bergman did not participate as an independent and neu-tral official, but rather acted at Kludt's direction to enforce the Festival Association's policies. Bergman also provided testi-mony that indicated that Gilroy police officers working at the festival were customarily trained as to the festival's dress code policy and had the authority to enforce it. Unlike in *Womancare*, then, Bergman was not summoned to the scene to exercise her neutral, independent judgment about the situa-tion, but was called in by the Festival Association's security chair in order to effectuate the plaintiffs' removal based on the Festival Association's own policies. There is thus a genu-ine issue of material fact as to whether Bergman's participa-tion rose to the level of "substantial cooperation" sufficient to establish state action under the joint activity test.

## II

The district court properly concluded that triable issues of fact precluded summary judgment as to the City and Officer Bergman on the question of state action.

## A

There is really no doubt that Officer Bergman was acting under color of law when she removed the Top Hatters from the festival. She was on duty with the City at the time of the incident. She was acting within the course and scope of her City employment. She was uniformed, visibly armed, and wearing a badge. She was summoned to assist because of her authority as a police officer. She identified herself as an offi-cer, and she used her official authority to remove the Top Hat-ters from the festival. These factors are clearly sufficient to establish she was acting under color of law when removing the Top Hatters, as the district court properly concluded. *See, e.g.*, *Traver v. Meshriy*, 627 F.2d 934, 938 (9th Cir. 1980) (holding that an off-duty officer serving as a security officer

at a bank was acting under color of law when the officer flashed police identification when arresting the plaintiff).

The City argues that Bergman was only there to "stand by in case of trouble." The record suggests otherwise and, at the minimum, there is certainly a triable issue of fact as to that assertion. As we noted in *Harris*, "police intervention and aid [in private enforcement actions] does constitute state action," and "there may be a deprivation within the meaning of § 1983 . . . when [an] officer assists in effectuating [the private enforcement action] . . . or so intimidates [the plaintiff] as to cause him to refrain from exercising his legal right[s]. . . ." 664 F.2d at 1127. The record indicates that Bergman used her authority to assist in removing the Top Hatters, and they acquiesced in response to her official authority and intimidation.

B

The district court also properly concluded that there were triable issues of fact as to the City's liability under § 1983 for Officer Bergman's actions. Of course, the mere fact that Officer Bergman was a state actor is not sufficient to establish the City's liability. To survive summary judgment on the issue of the City's liability for Officer Bergman's actions, the Top Hatters must demonstrate that there is a genuine issue of material fact as to whether she acted pursuant to a governmental policy or custom. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94 (1978) ("[L]ocal governments, like every other § 1983 'person,' . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."). In a *Monell* claim, there are three ways to show a policy or custom of a municipality: (1) by showing "a longstanding practice or custom which constitutes the standard operating procedure of the local government entity"; (2) "by showing that the decision-making official was, as a matter of state law, a final

policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision"; or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984-85 (9th Cir. 2002) (internal quotation marks and citations omitted).

The key question here is whether the City had a policy or custom of enforcing the Festival Association's dress code at the 2000 festival. There clearly is a triable issue of fact as to that question. Officer Bergman testified that an incident at the 1992 festival "helped inspire a type of *policy* tightening down dress code type issues." (Emphasis added). In response to the question of whether she had received any type of directive or order from the supervisor of police operations as to the dress code, she responded that officers stationed at the festival attended briefings where "[the supervisor] would basically give parameters of the dress code." She summarized these parameters by explaining that "we were trying to exclude group clothing that could inspire conflict." Consequently, she testified that she would have enforced the dress code on her own initiative to expel visitors dressed in apparent gang colors and probably would have ejected a visitor wearing a Nazi uniform. In short, Officer Bergman's understanding was that she was "to exclude any type of group clothing that could create a problem" and that she had the authority to confront or eject someone based on dress code. "If there was any type of question on whether something should or should not be permitted," she explained, "we would contact a supervisor and go through them with their decision." Sergeant Kludt testified that the Festival Association gave directions to all of the officers concerning the dress code policy. During the incident in question, both he and Officer Bergman explained the dress code policy to the Top Hatters and indicated the policy would be enforced.

The direct evidence of custom or policy is much stronger in this case than in others in which we have held there are tri-

able factual issues concerning custom. *See Blair v. City of Pomona*, 223 F.3d 1074, 1080 (9th Cir. 2000) (testimony about "a code of silence" among police officers sufficient to create a triable issue of fact); *Wallis v. Spencer*, 202 F.3d 1126, 1142 (9th Cir. 2000) (custom inferred from police conduct); *Henry v. County of Shasta* 132 F.3d 512, 518 (9th Cir. 1997) (same); *Navarro v. Block*, 72 F.3d 712, 715 (9th Cir. 1995) (911 dispatcher's testimony that it was the practice of the Sheriff's Department not to classify domestic violence calls as emergencies sufficient to create a triable issue of fact). Indeed, there is no evidence at all in the record that the City officers assigned to the festival were not to enforce—or assist in the enforcement of—the Festival Association's unwritten dress code.

In considering the grant of summary judgment, we must draw all inferences and construe the record evidence in the light most favorable to the Top Hatters. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Considering the record evidence, there is little doubt that the City had a policy of assisting in the enforcement of the Festival Association's dress code in 2000. Therefore, there exists a triable issue of fact as to the City's potential liability under *Monell*, as the district court correctly concluded. I thus respectfully disagree with the majority that summary judgment was appropriate as to the City.

### III

The panel decision concluding that the Top Hatters' constitutional rights were not violated has been designated as non-precedential and the majority has declined to reach that issue. Thus, it is unnecessary to discuss that question in any detail. However, if we were to reach the issue, I would hold that under our precedent in *Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002), the Top Hatters' act of wearing their motorcycle club vests and insignia was expres-

sive conduct deserving of protection under the First Amendment.

For the reasons expressed herein, I respectfully dissent.

---

GOULD, Circuit Judge, dissenting in part:

Because there was no "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the City of Gilroy to enforce the dress code at issue, the city is not liable under *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978). Accordingly, I agree with much of the substance of the majority's presentation in Part IV of the majority opinion. Stated another way, I agree with the majority's *Monell* analysis, except for footnote 5 and the sentence reciting "[b]ecause there is no constitutional violation, there can be no municipal liability."

Because I conclude that there is an issue of fact as to whether the Gilroy Garlic Festival Association and the City of Gilroy engaged in joint action sufficient to render the festival a state actor, I join Part I of Judge Thomas's dissent. If this fact issue is decided favorably to appellants, then there is the distinct possibility of constitutional violation, but that issue cannot correctly be reached on the current record.